

**ORDERED in the Southern District of Florida on October 1, 2018.**

**Erik P. Kimball, Judge**
**United States Bankruptcy Court**

---

### UNITED STATES BANKRUPTCY COURT
### SOUTHERN DISTRICT OF FLORIDA
### WEST PALM BEACH DIVISION

In re:

**ROLLAGUARD SECURITY, LLC,**
**SHAMROCK JEWELERS, INC., and**
**SHAMROCK JEWELERS LOAN**
**& GUARANTEE, LLC,**

     **Debtors.**

_____/

**ROBERT C. FURR,** not individually but
as Chapter 7 Trustee of the estates of the
Debtors, Rollaguard Security, LLC, *et al.,*

     **Plaintiff,**

v.

**TD BANK, N.A.,**

     **Defendant.**

_____/

**ROBERT C. FURR,** not individually but
as Chapter 7 Trustee of the estates of the
Debtors, Rollaguard Security, LLC, *et al.,*

     **Plaintiff,**

Case No. 14-38071-EPK
(Substantively Consolidated)

Chapter 7

Adv. Proc. No. 16-01755-EPK

v.                                                                    Adv. Proc. No. 16-01756-EPK

**PNC BANK, N.A.,**

      **Defendant.**
_____/

**ROBERT C. FURR, not individually but
as Chapter 7 Trustee of the estates of the
Debtors, Rollaguard Security, LLC,** *et al.,*

      **Plaintiff,**

v.                                                                    Adv. Proc. No. 16-01757-EPK

**JPMORGAN CHASE BANK, N.A.
d/b/a CHASE BANK,**

      **Defendant.**
_____/

## OMNIBUS ORDER AFTER REMAND ON
## PLAINTIFF'S REQUEST FOR LEAVE TO FILE AMENDED COMPLAINTS

      Robert C. Furr, as trustee (the "Trustee" or "Plaintiff") in the substantively consolidated chapter 7 cases of Rollaguard Security, LLC ("Rollaguard"), Shamrock Jewelers, Inc. ("Shamrock Jewelers"), and Shamrock Jewelers Loan & Guarantee, LLC, commenced these three adversary proceedings by complaints filed on December 29, 2016.  The Trustee brought substantially identical claims against TD Bank, N.A. ("TD Bank") (Adv. Proc. No. 16-01755-EPK), PNC Bank, N.A. ("PNC Bank") (Adv. Proc. No. 16-01756-EPK), and JPMorgan Chase Bank, N.A. d/b/a Chase Bank ("JPMC Bank") (Adv. Proc. No. 16-01757-EPK) (collectively, the "Defendants").  The Defendants moved to dismiss and, after full briefing, the Court granted those motions and entered judgments in favor of the Defendants.  Thereafter, the Trustee sought reconsideration of the dismissal order and, in the alternative, permission to file amended complaints.  The Court denied the Trustee's request for reconsideration of the Court's legal rulings made in granting the motions to dismiss.  The Court also ruled, consistent with prevailing law in this circuit, that because judgments had been entered in favor

of the Defendants the Trustee must first obtain relief from the judgments under the applicable rules of civil procedure and only then would the Court consider the Trustee's request to amend the complaints. After a hearing to consider the Trustee's request to amend the complaints, the Court denied that request. The Trustee appealed the Court's orders dismissing the adversary proceedings, the judgments, and the orders denying the Trustee's motion to reconsider and for permission to file amended complaints. On appeal, the District Court ruled that the more lenient standard of Fed. R. Bankr. P. 7015 applied even though this Court had entered judgments in favor of the Defendants, and remanded the cases to this Court to consider the Trustee's request to file amended complaints under that standard. As discussed more fully below, after a careful review of the Trustee's proposed amended complaints, the Court rules that the proposed amendments would be futile and thus denies the Trustee's request to file amended complaints.

## ORIGINAL COMPLAINTS

Each of the original complaints in these adversary proceedings alleged substantially the same facts and presented the same five requests for relief. In counts I and II of the original complaints, the Trustee sued the Defendants to avoid alleged fraudulent transfers made by Rollaguard and Shamrock Jewelers (together, the "Debtors")[1] to the Defendants under the actual and constructive fraud provisions of sections[2] 548(a)(1)(A)-(B) and under the actual and constructive fraud provisions of section 544 incorporating Florida Statutes §§ 726.105(1)(a)-(b), and to recover the alleged fraudulent transfers from the Defendants pursuant to section 550. In counts III, IV, and V of the original complaints, the Trustee sought money damages for the Defendants' alleged aiding and abetting of conversions and for their alleged negligence.

---

[1] In the original complaints, the Trustee included alleged transfers by Shamrock Jewelers Loan & Guarantee, LLC, but in the proposed amended complaints the Trustee states that Shamrock Jewelers Loan & Guarantee, LLC did not maintain any bank accounts with any of the Defendants and is not the subject of any claims in the proposed amended complaints.
[2] Unless otherwise noted, the word section or sections refers to the stated section or sections of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.*

**MOTIONS TO DISMISS**

In response to the original complaints, each of the Defendants filed a motion to dismiss [ECF No. 26, Adv. Proc. No. 16-01755-EPK; ECF No. 26, Adv. Proc. No. 16-01756- EPK; and ECF No. 21, Adv. Proc. No. 16-01757-EPK].  In the motions to dismiss, the Defendants raised substantially similar arguments in opposition to the original complaints and adopted each other's arguments.  The Court permitted the parties to brief the motions to dismiss in full [ECF Nos. 38 and 39, Adv. Proc. No. 16-01755-EPK; ECF Nos. 42 and 43, Adv. Proc. No. 16-01756-EPK; and ECF Nos. 30 and 31, Adv. Proc. No. 16-01757-EPK].

**ORDER GRANTING MOTIONS TO DISMISS**

On July 27, 2017, the Court entered a consolidated order dismissing with prejudice all three adversary proceedings [ECF No. 43, Adv. Proc. No. 16-01755-EPK; ECF No. 50, Adv. Proc. No. 16-01756- EPK; and ECF No. 33, Adv. Proc. No. 16-01757-EPK] (the "Dismissal Order").  The Court dismissed counts I and II on several grounds.  First, the Court ruled that the original complaints did not describe any "transfers" that could be avoided as fraudulent transfers under either section 548 or section 544 incorporating Florida law.  Second, the Court ruled that the Defendants are not "transferees" from whom the Trustee may recover under section 550(a)(1).  Third, the Court ruled that the original complaints did not contain sufficient allegations to plausibly support the conclusion that the Debtors deposited their own funds into their own unrestricted bank accounts with the intent to hinder, delay, or defraud creditors, as required by the relevant statutes, and so the Trustee's actual fraud claims in counts I and II must be dismissed.  Fourth, the Court ruled that the Debtors obtained reasonably equivalent value in exchange for the bank deposits, and so the Trustee's constructive fraud claims in counts I and II must be dismissed.  Fifth, the Court ruled that the Trustee's claims in counts I and II based on section 544, incorporating Florida law, must be dismissed as the Trustee failed to identify by name at least one triggering creditor for each such claim.  The Court ruled that the claims

4

relating to Shamrock Jewelers Loan & Guarantee, LLC in counts IV and V must be dismissed as a result of the application of the *in pari delicto* defense, as that defense was apparent on the face of the original complaints. The Court ruled that counts III and IV of the original complaints must be dismissed as the Trustee failed to allege sufficient facts to show that any of the Defendants had actual knowledge of the alleged conversion by the Debtors' principal or that any of the Defendants rendered substantial assistance to the Debtors' principal, two independent reasons for dismissal of those claims. The Court ruled that the claims in count V based in negligence must be dismissed as the Trustee failed to plead a duty of care on the part of the Defendants. Because the Trustee did not seek permission to amend the original complaints, consistent with prevailing law in this circuit the Court dismissed the original complaints with prejudice. The Court then entered judgments in favor of the Defendants [ECF No. 45, Adv. Proc. No. 16-01755-EPK; ECF No. 52, Adv. Proc. No. 16-01756-EPK; and ECF No. 35, Adv. Proc. No. 16-01757-EPK].

## MOTION FOR RECONSIDERATION AND/OR TO AMEND COMPLAINTS

The Trustee then filed an omnibus motion seeking reconsideration of the Dismissal Order and the judgments under Fed. R. Civ. P. 59(e), 60(b)(6), and 15(a)(2), made applicable here by Fed. R. Bankr. P. 9023, 9024, and 7015, respectively, and/or permission to file an amended complaint in each adversary proceeding [ECF No. 50, Adv. Proc. No. 16-01755-EPK; ECF No. 57, Adv. Proc. No. 16-01756-EPK; and ECF No. 40, Adv. Proc. No. 16-01757-EPK]. The Trustee asked the Court to reconsider several legal issues addressed in the Dismissal Order. The Trustee argued that the bank deposits alleged in the original complaints were "transfers" avoidable as fraudulent transfers, that it was not proper for the Court to address the "conduit defense" at the motion to dismiss stage and so the Court should not have ruled that none of the Defendants are "transferees" subject to judgment under relevant law, and that the original complaints contained sufficient allegations to overcome the

other shortcomings relied on by the Court in dismissing the original complaints.[3]  In the alternative,

the Trustee sought leave to file amended complaints against each of the Defendants.  The Trustee

stated that he received discovery from the Defendants after the motions to dismiss were fully briefed.[4]

The Trustee alleged that the recently received documents contained new evidence, not available prior

to the filing of the original complaints, which supported certain of the Trustee's original claims and

new claims for aiding and abetting breach of fiduciary duty.  The Trustee sought permission to file

amended complaints, in the forms attached to the Trustee's omnibus motion, that the Trustee stated

incorporated the new evidence.

## RULINGS ON MOTION FOR RECONSIDERATION/AMENDMENT

The Court entered two orders in connection with the Trustee's omnibus motion for

reconsideration and/or for permission to filed amended complaints.  In the first order, the Court

denied the Trustee's request for the Court to reconsider its legal rulings in dismissing these adversary

proceedings [ECF No. 51, Adv. Proc. No. 16-01755; ECF No. 58, Adv. Proc. No. 16-01756; ECF

No. 41, Adv. Proc. No. 16-01757].  In that first order the Court also ruled that, because the Court had

entered judgments in favor of the Defendants, in order to obtain permission to file the proposed

amended complaints the Trustee must first obtain relief from judgment under Fed. R. Bankr. P. 9023

(incorporating Fed. R. Civ. P. 59) or Fed. R. Bankr. P. 9024 (incorporating Fed. R. Civ. P. 60), and

only then would the Trustee have the benefit of the more lenient standard under Fed. R. Bankr. P.

---

[3] In the motion to reconsider, the Trustee several times mischaracterized the Court's actual rulings in dismissing these adversary proceedings, and cited without explanation case law that the Court previously distinguished or which is contradicted by decisions of the same court, including the Eleventh Circuit Court of Appeals.

[4] From the Trustee's omnibus motion, it was not clear when the Trustee received the discovery materials in question, what form they took, the volume of those discovery materials, or whether they were material to the Trustee's claims. The Trustee stated only that the discovery materials were delivered after entry of an agreed order regarding discovery on June 22, 2017. The Court entered its dismissal order on July 27, 2017, more than a month later. The Court later learned that the discovery materials were not voluminous or difficult to parse, the Trustee was unable to explain to the Court's satisfaction why the Trustee had not acted on the discovery materials prior to the Court's ruling on the motion to dismiss, and in any case the discovery materials did not materially augment the allegations in the original complaints. In the Court's view, the Trustee relied on the discovery materials as an excuse to present a tardy request for permission to amend the original complaints.

7015 (incorporating Fed. R. Civ. P. 15).  The Court set a hearing to permit the Trustee to show the Court how it could satisfy these requirements.

On November 7, 2017, the Court held a hearing on the Trustee's request for permission to amend the complaints.  At the end of that hearing, after an extensive and detailed review of the alleged new evidence and the proposed amended complaints, the Court made a ruling on the record.  That oral ruling was incorporated into a written order, which is the second order addressing the Trustee's motion for reconsideration and/or permission to file amended complaints [ECF No. 69, Adv. Proc. No. 16-01755-EPK; ECF No. 76, Adv. Proc. No. 16-01756- EPK; and ECF No. 58, Adv. Proc. No. 16-01757-EPK].  Among other things, the Court ruled that the Trustee had not satisfied the standards of Fed. R. Bankr. P. 9023 or 9024 because, first, the Trustee had obtained the so-called new evidence before the Court granted the motions to dismiss and had failed to act on it in a timely manner, second, even if that timing was ignored the Trustee had not been diligent in obtaining the so-called new evidence and, third, nothing in the so-called new evidence would cause the Court to change its rulings in the original Dismissal Order.

It is useful to draw attention to this last point — that nothing in the discovery materials that the Trustee pointed to as the catalyst for its proposed amended complaints would cause the Court to change any of its rulings in the Dismissal Order.  The proposed amended complaints include changes to nearly every page of the original complaints.  While the Trustee has moved some text around, and added color to the allegations in the form of more negative sounding phrasing and semantic flourishes, there are few actually new factual allegations in the proposed amended complaints.  Indeed, from the way the proposed amended complaints were revised as compared to the original complaints, it appears that the text was modified in part to make it seem that there was significant actually new material.  Only through a painstaking review of the redlined proposed amended complaints, highlighter in hand, was the Court able to identify the truly new factual allegations.  In the end, the few new factual

allegations are simply more of the same kinds of allegations that the Court found insufficient in the Dismissal Order, coupled with conclusory statements that do not necessarily follow from the concrete factual allegations.

Not surprisingly then, in the November 7, 2017 oral ruling the Court specifically stated with regard to the claims presented in counts I through V -- "Even if Rule 15 applied at this stage of the litigation, and it does not because the newly discovered evidence argument fails, the proposed amendments would be futile." [Page 202, Line 25 – Page 203, Line 3 in ECF No. 83, Adv. Proc. No. 16-01755-EPK; ECF No. 91, Adv. Proc. No. 16-01756- EPK; and ECF No. 73, Adv. Proc. No. 16-01757-EPK].  In its ruling on appeal, the District Court interpreted this sentence as applying only to the negligence claims presented in count V.  It appears that the District Court's conclusion resulted from an unfortunate inclusion of the quoted sentence in a paragraph of the transcript addressing only count V.  But this Court intended the quoted statement to apply to all of proposed amended counts I though V.  Indeed, a review of the Court's oral ruling will reveal that the Court addressed each of counts I through V prior to that statement, indicating that the proposed amendments did not resolve the Court's concerns in the Dismissal Order.  The Court went on to consider the new counts VI and VII of the proposed amended complaints, ruling that those claims suffered from the same shortcomings as the similar counts III and IV and so the amendments to include counts VI and VII would be futile.  Thus, the Court has already ruled that the proposed amended complaints would be futile as to nearly all of the claims presented.  The only claims not explicitly included in the Court's futility analysis at the hearing on November 7, 2017 were the Trustee's fraudulent transfer claims arising from satisfaction of overdrafts.  At that time, the Court denied the Trustee's proposed amendments incorporating those claims based solely on the Trustee's failure to satisfy the requirements of Fed. R. Bankr. P. 9023 or 9024.

## APPEAL AND DISTRICT COURT RULING

The Trustee appealed the Court's consolidated Dismissal Order, the judgments entered in favor of the Defendants, and the two orders denying the Trustee's motion to reconsider and denying the Trustee's request for permission to file amended complaints [ECF No. 71, Adv. Proc. No. 16-01755-EPK; ECF No. 78, Adv. Proc. No. 16-01756- EPK; and ECF No. 60, Adv. Proc. No. 16-01757-EPK].

On appeal, the District Court ruled that this Court had applied an incorrect standard in denying the Trustee's request for permission to file amended complaints [ECF No. 90, Adv. Proc. No. 16-01755-EPK; ECF No. 98, Adv. Proc. No. 16-01756- EPK; and ECF No. 80, Adv. Proc. No. 16-01757-EPK].  Specifically, the District Court ruled that the standard under Fed. R. Bankr. P. 7015 (incorporating Fed. R. Civ. P. 15) applies to a request to amend a complaint even after judgment is entered.  The District Court remanded the matter to this Court and directed this Court to consider the Trustee's request for permission to file amended complaints under the standard set out by the Supreme Court in *Foman v. Davis*, 371 U.S. 178 (1962).[5]  The District Court did not rule on the other issues raised in the appeal.

## ANALYSIS ON REMAND

The Trustee's request for permission to file amended complaints is well presented in the motions originally filed by the Trustee, in which the Trustee argues the same standard required by the District Court on remand, among other arguments [ECF No. 50, Adv. Proc. No. 16-01755-EPK; ECF No. 57, Adv. Proc. No. 16-01756-EPK; and ECF No. 40, Adv. Proc. No. 16-01757-EPK].  The Defendants recently filed notices stating that they do not intend to attempt to appeal the District

---

[5] In *Foman*, the Supreme Court ruled that leave to amend a complaint should be freely given "[i]n the absence of any apparent or declared reason – such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc." *Foman*, 371 U.S. at 182.

Court's order remanding this matter and, while they would be willing to file additional briefs if requested by this Court, stating that they believe the record is sufficient for the Court to rule on the Trustee's request for permission to file amended complaints [ECF No. 92, Adv. Proc. No. 16-01755-EPK; ECF No. 100, Adv. Proc. No. 16-01756-EPK; and ECF No. 82, Adv. Proc. No. 16-01757-EPK]. The Court agrees and does not find it necessary to require additional briefing. The Court has carefully reviewed the Trustee's motion and the proposed amended complaints.

### Background

Anthony T. Simpson was the Managing Member of Rollaguard and David Tabony was the Chief Financial Officer and Vice President of Rollaguard. Prior to the filing of this chapter 7 case, Mr. Simpson was removed as managing member and resigned all management responsibilities with respect to Rollaguard. Rollaguard was then controlled by a group of independent investors. Mr. Tabony caused Rollaguard to file the chapter 7 petition commencing this case on December 30, 2014.

Mr. Simpson was also the President of Shamrock Jewelers and his spouse, Debra Simpson, was the Vice President of Shamrock Jewelers. Mr. Simpson was the sole member of Shamrock Jewelers Loan & Guarantee, LLC. Shamrock Jewelers and Shamrock Jewelers Loan & Guarantee, LLC are sometimes referred to together as the "Shamrock Entities."

Rollaguard represented itself as a manufacturer of traceable security cases used to transport valuable items, such as jewelry and sensitive documents. Rollaguard, under the control of Mr. Simpson, sought investors and raised substantial capital in order to finance the manufacture, marketing, and sale of security cases.[6] However, at the time Rollaguard filed its chapter 7 petition, Rollaguard was not engaged in a viable business venture. Indeed, it appears Rollaguard never manufactured a single security case.

---

[6] Rollaguard's schedules reflect that it received capital investments exceeding $12 million. Schedule F, ECF No. 24, Case No. 14-38071-EPK.

Shamrock Jewelers operated a jewelry store in Florida from approximately 1965 to 2015. Shamrock Jewelers also claimed to operate a pawn brokerage business.  Mr. Simpson created Shamrock Jewelers Loan & Guarantee, LLC to help facilitate the pawn brokerage business.  The pawn brokerage business contemplated a series of pawn-loan transactions where the Shamrock Entities would provide short-term loans to customers in exchange for jewelry.  The Shamrock Entities, under the control of Mr. Simpson, raised capital from investors in order to finance the purported pawn brokerage business.  However, the Shamrock Entities did not in fact engage in any pawn brokerage. In addition, capital investments raised by Mr. Simpson on behalf of Rollaguard were routinely used by the Shamrock Entities.

Mr. Simpson manipulated Rollaguard and the Shamrock Entities to defraud investors and obtain funds for himself.  Prior to filing these adversary proceedings against the Defendants, the Trustee obtained, among other relief, a final default judgment of $2,208,407.60 against Mr. Simpson and his spouse for pre-petition transfers from Rollaguard.  ECF No. 70, Adv. Proc. No. 15-01311-EPK.  It appears that Mr. Tabony and Ms. Simpson were each without knowledge of any wrongdoing by Mr. Simpson.

The Debtors maintained four bank accounts at TD Bank from December 2010 through November 2013, three bank accounts at PNC Bank from December 2010 through December 2014, and three bank accounts at JPMC Bank from July 2014 through March 2015.  During the four-year period before the commencement of this chapter 7 case, the Debtors deposited monies into and withdrew monies from the various bank accounts maintained at TD Bank, PNC Bank, and JPMC

Bank.[7]  Sometimes the Debtors' withdrawals resulted in those accounts becoming overdrawn.[8]  The Debtors also freely transferred monies between the various accounts maintained at TD Bank, PNC Bank, and JPMC Bank, but always within the respective banking institution.[9]

Each of the subject bank accounts was a typical demand deposit account.  There is nothing in the original complaints or the proposed amended complaints that would lead the Court to conclude that the Debtors ever gave up complete autonomy over the various accounts.  Indeed, the Trustee makes it clear that the Debtors in fact exercised unfettered discretion with the various accounts, depositing and withdrawing funds, transferring funds, and making payments from the accounts, whenever, in whatever amounts, and however they liked.  When this bankruptcy case was filed the Debtors' accounts at the Defendants either had a very small balance or were slightly overdrawn.  On the date each Debtor became subject to this case, the Debtors had, in effect, no funds on deposit at TD Bank, PNC Bank, or JPMC Bank.  The Debtors had abandoned their banking relationships with TD Bank more than a year prior to the filing of this case and with PNC Bank at the time of the filing of the petition.  Shamrock Jewelers' use of accounts at JPMC Bank continued through March 2015, about six months prior to its substantive consolidation with Rollaguard in September 2015.  ECF No. 126, Case No. 14-38071-EPK.  In other words, the Debtors had used the various accounts for several years and then left them empty, in each case before the relevant Debtor became part of this case.

---

[7] According to the amended complaints: (1) during the banking relationship between the Debtors and TD Bank, the Debtors deposited no less than $21,055,042.00 and withdrew no less than $21,146,529.00; (2) during the banking relationship between the Debtors and PNC Bank, the Debtors deposited no less than $9,853,183.82 and withdrew no less than $9,852,488.75; and (3) during the banking relationship between the Debtors and JPMC Bank, the Debtors deposited no less than $4,368,395.29 and withdrew no less than $4,368,729.18.

[8] According to the amended complaints the accounts at TD Bank were overdrawn from time to time in the aggregate amount of $939,633.00, the accounts at PNC Bank were overdrawn from time to time in the aggregate amount of $170,476.00, and the accounts at JPMC Bank were overdrawn from time to time in the aggregate amount of $1,916.00. The Trustee alleges that most of the overdrafts were later repaid or otherwise satisfied by the relevant Debtor and that such repayments and satisfactions constitute avoidable transfers.

[9] According to the amended complaints: (1) the Debtors transferred no less than $3,675,841.00 among the accounts at TD Bank; (2) the Debtors transferred no less than $956,756.00 among the accounts at PNC Bank; and (3) the Debtors transferred no less than $100,092.00 among the accounts at JPMC Bank.

**Counts I and II**

As in the original complaints, in counts I and II of the proposed amended complaints the Trustee argues that the Debtors' regular deposits to the various bank accounts maintained at TD Bank, PNC Bank, and JPMC Bank constitute actual fraudulent transfers avoidable under section 548 or under section 544 incorporating Florida law.  In other words, the Trustee argues that each time one of the Debtors deposited funds into its own unrestricted accounts at TD Bank, PNC Bank, or JPMC Bank, that deposit constituted a fraudulent transfer to the relevant Defendant that the Trustee may avoid under applicable law.  The Trustee seeks a judgment avoiding each such transfer and a money judgment against each of the Defendants.[10]

In counts I and II of the proposed amended complaints, the Trustee describes a new category of claims arising from the Debtors' repayment or satisfaction of overdrafts in their accounts with the Defendants.[11]  The Trustee alleges that the Debtors from time to time overdrew their accounts at the Defendants.  The Trustee refers to these overdrafts as "Overdraft Loans."  The Trustee alleges that the overdrafts were repaid by future deposits or by dishonored transactions and that each of these constitutes an avoidable fraudulent transfer.  To some extent, as discussed below, the fraudulent transfer claims relating to satisfaction of overdrafts are legally distinct from the fraudulent transfer claims arising solely from a Debtor's deposit into its own unrestricted bank account.

To prove his fraudulent transfer claims, the Trustee must show that there was a fraudulent transfer under section 548 or under section 544 incorporating Florida Statutes § 726.105(1)(a).  Among other things, this requires the Trustee to show there was in fact a transfer within the meaning of section 101(54) and Florida law.  And then the Trustee must show that each Defendant is a party from

---

[10] In the original complaints, counts I and II also included claims based in constructive fraud.  In the proposed amended complaints the Trustee does not pursue any claims based in constructive fraud and so the Court need not address certain of the issues ruled on in the Dismissal Order.

[11] While the Trustee noted the existence of overdrafts in the original complaints, the Trustee did not specifically allege fraudulent transfer claims arising from satisfaction of overdrafts.

whom the Trustee may recover under section 550. "Section 550 allows a trustee to recover the fraudulently transferred property from the initial transferee, the entity for whose benefit the transfer was made, or a subsequent transferee of the initial transferee." *In re Chase & Sanborn Corp.*, 848 F.2d 1196, 1198 (11th Cir. 1988) (citing 11 U.S.C. § 544(a)).

Under the actual fraud provision of section 548, the Trustee "may avoid any transfer . . . of an interest of the debtor in property," made within two years before the filing of a bankruptcy petition, if the debtor made such transfer "with actual intent to hinder, delay, or defraud" any existing or future creditor. 11 U.S.C. § 548(a)(1)(A). Under section 544(b)(1), the Trustee "may avoid any transfer of an interest of the debtor in property . . . that is voidable under applicable law by a creditor holding an [allowable] unsecured claim." The Trustee argues that he can avoid the relevant transfers under section 544(b)(1) because they are voidable under Florida law, specifically Florida Statutes § 726.105(1)(a). Under this provision, a transfer made within four years before the filing of a bankruptcy petition is avoidable if the debtor made such transfer "[w]ith actual intent to hinder, delay, or defraud any creditor of the debtor[.]" Fla. Stat. § 726.105(1)(a).

The Trustee's fraudulent transfer claims under section 544(b), incorporating Florida law, are analogous "in form and substance" to their bankruptcy counterparts in section 548(a)(1) "and may be analyzed contemporaneously." *Woodard v. Stewart (In re Stewart)*, 280 B.R. 268, 273 (Bankr. M.D. Fla. 2001) (citations omitted). "The only material difference between the state and bankruptcy provisions is the favorable four-year look-back period under the Florida law." *Kapila v. Suntrust Mortg. (In re Pearlman)*, 515 B.R. 887, 894 (Bankr. M.D. Fla. 2014) (citations omitted).

The Debtors' deposits into their own unrestricted bank accounts maintained at the Defendants do not constitute "transfers" within the meaning of that term under section 101(54) or Florida law, and so cannot form the basis for the Trustee's fraudulent transfer claims (other than the claims relating to satisfaction of overdrafts, addressed below). While the Eleventh Circuit has not ruled on this

specific issue, Eleventh Circuit case law provides persuasive support for the conclusion that there is no avoidable transfer when a debtor deposits its own funds to its own unrestricted bank account. Numerous other courts, including circuit courts of appeal, have so ruled.

Section 101(54) defines "transfer," in pertinent part, as any "mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with . . . property; or . . . an interest in property." 11 U.S.C. § 101(54)(D)(i)-(ii). For this purpose, Florida statutes define the term "transfer" in an essentially identical manner: "'Transfer' means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset[.]" Fla. Stat. § 726.102(14).

Technically, when one makes a deposit with a bank, the bank becomes the owner of the funds. It is presumed that the bank will use the funds to make loans to others. The depositor becomes a creditor of the bank. When the depositor seeks to withdraw funds or use them to make a payment via check or other method, the depositor is a creditor of the bank seeking payment from the bank. *See Menotte v. United States (In re Custom Contractors, LLC)*, 745 F.3d 1342, 1350 (11th Cir. 2014). Recognizing the debtor-creditor relationship between a depositor and a bank, some courts have ruled that the deposit of funds into the debtor's own unrestricted bank account is a "transfer" for purposes of federal and state fraudulent transfer analysis. *See, e.g., Bernard v. Sheaffer (In re Bernard)*, 96 F.3d 1279, 1282-83 (9th Cir. 1996) (applying California debtor-creditor law in ruling that a typical bank deposit is a transfer).

On the other hand, the overwhelming majority of courts considering the issue have ruled that the special rights of a depositor vis-a-vis the bank take precedence over the technical legal relationship, at least for purposes of fraudulent transfer analysis. *See, e.g., Ivey v. First Citizens Bank & Trust Co. (In re Whitley)*, 848 F.3d 205, 208-10 (4th Cir. 2017), *cert. denied*, 138 S. Ct. 314, 199 L. Ed. 2d 207 (2017) (holding that "when a debtor deposits or receives a wire transfer of funds into his own unrestricted

checking account in the regular course of business, he has not transferred those funds to the bank that operates the account [because] the debtor is still free to access those funds at will"); *In re Prescott*, 805 F.2d 719, 729 (7th Cir. 1986) (holding that "to the extent a deposit is made into an unrestricted checking account, in the regular course of business and withdrawable at the depositor's will, it is not avoidable by the trustee") (citing *Katz v. First Nat'l Bank of Glen Head*, 568 F.2d 964, 969 (2d Cir. 1977), *cert. denied*, 434 U.S. 1069 (1978)); *Katz*, 568 F.2d at 969 ("It is well settled that deposits in an unrestricted checking account, made in the regular course of business, do not constitute transfers within the meaning of the Bankruptcy Act.") (citations omitted); *Wiand v. Wells Fargo Bank, N.A.*, 86 F. Supp.3d 1316, 1327 (M.D. Fla. 2015), *aff'd*, 677 F. App'x 573 (11th Cir. 2017) (holding that since the principal "was essentially transferring funds to and from himself, he (and the entities he controlled) never disposed of or parted with the 'assets' and therefore no transfers took place."); *In re Tonyan Constr. Co.*, 28 B.R. 714, 728-29 (Bankr. N.D. Ill. 1983) ("Ordinarily, a deposit in an unrestricted checking account does not constitute a parting with property, because it 'results in substituting for currency, bank notes, checks, drafts, and other bankable items a corresponding credit with the bank, which may be checked against[.]'") (quoting *Citizens' Nat'l Bank of Gastonia, N.C. v. Lineberger*, 45 F.2d 522, 527 (4th Cir. 1930)); *In re Perry*, 336 F. Supp. 420, 425 (D.S.C. 1972) (ruling that "deposits and subsequent set-offs are not transfers" because they "result in a substitution of credit for various forms of commercial paper or currency" and "are withdrawable at the will of the depositor") (citing *Joseph F. Hughes & Co. v. Machen*, 164 F.2d 983, 986-87 (4th Cir. 1947)).

This line of cases recognizes that when a depositor places its own funds in an unrestricted bank account, the depositor is not truly disposing of or parting with the funds as contemplated by the definition of the term "transfer."  For all practical purposes, the depositor to a traditional demand deposit account retains complete autonomy over the funds, with the unfettered ability to withdraw them, transfer them to other accounts, use them to write checks, or use them to make wire or other

electronic payments. *Whitley*, 848 F.3d at 209-10 (summarizing cases that hold bank deposits do not constitute transfers under section 101(54)). As is apparent from the proposed amended complaints, the Debtors in fact withdrew, transferred, and paid out from their accounts with the Defendants, in the end leaving the accounts in question empty or overdrawn. If there was any transfer at all in making the deposits, the Debtors were transferring funds to themselves; by making the deposits the Debtors were not disposing of or parting with the funds, and so no avoidable transfers took place. *Wiand*, 86 F. Supp. 3d at 1327-29.

That a deposit into one's own unrestricted bank account is not a transfer under fraudulent transfer law is consistent with decades of case law in this and other circuits analyzing whether a particular defendant is an initial or subsequent transferee of a fraudulent transfer. Section 550(b) provides an important distinction between initial and subsequent transferees. Only a subsequent transferee may take advantage of the value and good faith defense provided in that section. Nearly all of the reported decisions involving fraudulent transfers of money involve payments made by check, wire transfer, or other electronic transfer from a debtor's bank account.[12] Obviously, in each such case the debtor's bank account balance resulted from deposits of various kinds. In some cases, the deposit into a debtor's account is followed almost immediately by the debtor transferring funds to another. If the Trustee's view here was correct, then in nearly every case where a debtor made a fraudulent transfer by check drawn on or wire transfer from a bank, the bank would have had to previously receive the funds in question, making the bank the initial transferee, and the recipient of the check or wire transfer would be a subsequent transferee, with the potential benefit of the good faith and for value defense. Yet all of the case law points to the payee of the check or wire transfer as the initial transferee under section 550(a)(1). Indeed, the Court was unable to find a decision in this

---

[12] In the case law, it is extremely unusual for the courts to address fraudulent transfers of money in the form of cash. Perhaps such transfers occur more often than we see in reported decisions and they are just more difficult to investigate or prove.

circuit where the payee on a check or wire transfer was not treated as the initial transferee of the funds. This is because in this context the case law is uniform in the assumption that funds held by a debtor in a demand deposit account are the debtor's funds, a direct asset of the debtor for purposes of fraudulent transfer analysis.

The legislative history of section 101(54), which defines "transfer," states that the term includes "[a] deposit in a bank account or similar account." S. Rep. No. 95-989, at 27 (1987) (the "Senate Report").  Taken out of context, this statement seems to support the conclusion that every deposit into every bank account is a "transfer."  But the Senate Report "did not . . . distinguish between different types of deposits; it merely articulated the general principle that 'transfer' is meant to encompass an array of transactions."  *In re Whitley*, 848 F.3d at 208.  The Senate Report merely provides support for the breadth of the concept of transfer, to include deposits into bank accounts when that act is otherwise within the scope of the term, meaning when it involves disposing of or parting with an interest in property.  When a debtor deposits funds into the account of another, or into an account where the debtor's interests are legally transcribed, for example, such a deposit may be a transfer.  A debtor's regular deposits into the debtor's own unrestricted bank accounts are not transfers within the meaning of section 101(54) or Fla. Stat. § 726.102(14).

In decisions where a debtor's deposit of funds into its own unrestricted bank account is not considered a transfer, courts sometimes refer to the deposits in question as "regular deposits" or deposits made "in the regular course of business."  *See, e.g., In re Whitley*, 848 F.3d at 210.  One might argue that the deposits in this case were made by Mr. Simpson to allow him to perpetuate his fraudulent scheme and so were not "regular."  Yet it is apparent from these decisions that the term "regular" refers to typical banking transactions between a bank and its customer and not to the business of the customer itself.  For example, in *In re Whitley*, the funds deposited with the defendant

bank resulted from the debtor's Ponzi scheme, but this did not disqualify the deposits from being considered "regular." *Id.* at 206-07, 210.

The Debtors' deposits into their own unrestricted bank accounts, other than those relating to satisfaction of overdrafts, are not "transfers" that may be subject to avoidance as fraudulent transfers. For this reason alone, such claims have no basis in law and the proposed amendments to those portions of counts I and II would be futile. This is the same legal ruling made by the Court in the Dismissal Order and nothing in the proposed amended complaints has any impact on that ruling. The Court notes that this ruling eliminates the vast majority of the Trustee's fraudulent transfer claims in the proposed amended complaints.

The claims presented in counts I and II of the proposed amended complaints, other than claims relating to satisfaction of overdrafts, also fail because the Defendants are not transferees of the deposited funds within the meaning of the relevant statutes. The Defendants lacked control over the deposited funds, making the Defendants "mere conduits" under Eleventh Circuit precedent. *See Martinez v. Hutton (In re Harwell)*, 628 F.3d 1312 (11th Cir. 2010). Thus, even if the Debtors' deposits to their own unrestricted bank accounts could be considered transfers for purposes of fraudulent transfer analysis, the Defendants are not transferees from whom the Trustee may recover.

Section 550(a)(1) provides that, to the extent a transfer is avoided under sections 548 or 544, "the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from[,]" among others, "the initial transferee of such transfer." Neither the Bankruptcy Code nor its legislative history define the term "transferee." *In re Harwell*, 628 F.3d at 1317 (citing *Bonded Fin. Servs., Inc. v. European Am. Bank*, 838 F.2d 890, 893 (7th Cir. 1988)). As the Eleventh Circuit has explained, "[t]he term 'initial transferee' is a term of art whose meaning in any given transaction is not always straightforward." *Andreini & Co. v. Pony Express Delivery Servs., Inc. (In re Pony Express Delivery Servs., Inc.)*, 440 F.3d 1296, 1300 (11th Cir. 2006).

"A 'literal or rigid interpretation' of the term [initial transferee] leads to the conclusion that 'the first recipient of the debtor's fraudulently-transferred funds is an initial transferee.'" *In re Custom Contractors, LLC*, 745 F.3d at 1349 (quoting *In re Harwell*, 628 F.3d at 1322). "Recognizing the inequity that would result if every initial recipient of fraudulently-transferred funds could be forced, as an initial transferee, to return the funds to the bankrupt's estate, [the Eleventh Circuit] crafted an exception—grounded in the equitable powers of the bankruptcy court—known as the 'mere conduit or control test.'" *Id.* The hallmark of the mere conduit or control test is the recognition that certain recipients of a debtor's assets cannot legally exercise control over those assets—can never legally use the assets for their own benefit—and so should not be held responsible for merely holding and/or disposing of the assets for the benefit of the debtor or another. *See In re Harwell*, 628 F.3d at 1317-24 (reviewing the development of the mere conduit or control test). This defense, which is "based on, and defined by, equity," requires the Court to take "a flexible, pragmatic, equitable approach," considering a transaction in its entirety, rather than focusing in on the particular transfer in question. *Id.* at 1322.

A debtor's own bank, where the debtor maintains its demand deposit accounts, is nearly always a conduit that cannot be held liable under section 550. As discussed above, when one deposits funds into a typical demand deposit account, the bank technically becomes the owner of the funds. The bank may use the funds to make loans to others. The depositor is a creditor of the bank, with the right to demand immediate repayment at any time. *See In re Custom Contractors, LLC*, 745 F.3d at 1350. But the bank-depositor relationship is not a typical debtor-creditor relationship. The Eleventh Circuit has repeatedly pointed to the depository bank as the ultimate example of a conduit for purposes of transferee analysis. For example, the Eleventh Circuit recently stated, "[o]ur case law . . . stands for the proposition that, when a bank receives funds in the form of a deposit, the attendant obligations owed to the transferor—namely to return the funds upon request—are sufficiently important that we will not hold the bank liable as an initial transferee in spite of the significant control it exercises over

the funds." *Id.* (citing *In re Chase & Sanborn Corp.*, 848 F.2d at 1200-02); *cf. In re Harwell*, 628 F.3d at 1324 ("In the vast majority of cases, a client's settlement funds transferred in and out of a lawyer's trust account will be just like bank transfers, and lawyers as intermediaries will be entitled to mere conduit status because they lack control over the funds. Mere conduits, such as lawyers and banks, do not have an affirmative duty to investigate the underlying actions or intentions of the transferor."). Following this Eleventh Circuit precedent, the Sixth Circuit ruled that a bank will not be held liable as an initial transferee because the bank does not gain dominion and control over a debtor's deposits by virtue of the bank being the debtor's depository bank. *Meoli v. Huntington Nat'l Bank*, 848 F.3d 716, 725-28 (6th Cir. 2017). Courts in this circuit have regularly applied this concept. *See, e.g., Super Vision Int'l, Inc., v. Mega Int'l Commercial Bank Co.*, 534 F. Supp. 2d 1326, 1344 (S.D. Fla. 2008), *aff'd*, No. 08-15031, 2009 U.S. App. LEXIS 8089, 2009 WL 1028034 (11th Cir. 2009) (granting motion to dismiss a fraudulent transfer claim against a bank which was alleged to have accepted the debtor's transfers of funds into accounts owned by the debtor at the bank) (citing *In re Chase & Sanborn Corp.*, 848 F.2d at 1200); *In re Colombian Coffee Co.*, 75 B.R. 177, 179 (S.D. Fla. 1987) ("[I]t would be both problematical and preposterous were courts to" find a depository bank a transferee under federal bankruptcy law when the bank "possessed no discretion with respect to the disposition of the funds – it was constrained to follow the debtor's instructions.").

To establish the mere conduit defense, a defendant must show both that it did not have legal control over the assets that it received and that the defendant "acted in good faith and as an innocent participant in the fraudulent transfer." *In re Harwell*, 628 F.3d at 1323. The context of *Harwell* is instructive. The defendant was the debtor's former counsel. *Id.* at 1314. In anticipation of collection attempts on a judgment entered in another state, the debtor transferred, or caused to be transferred, a substantial sum to his counsel, who placed it in his attorney trust account. *Id.* The defendant (former counsel) then assisted the debtor in avoiding paying the substantial judgment by making distributions

21

from the trust account to the debtor and others at the debtor's direction. *Id.* at 1314-15. In ruling on a motion for summary judgment, the bankruptcy court assumed that the defendant was the mastermind of the debtor's scheme to defraud the judgment creditor, but determined that under prevailing Eleventh Circuit precedent the defendant lacked legal control over the funds and could not be held liable as a transferee. *Id.* at 1316, 1323. The Eleventh Circuit focused on the obvious lack of good faith of the defendant, which was assumed by the bankruptcy court for purposes of the ruling. *Id.* at 1324. The Eleventh Circuit stated that the mere conduit or control defense required the defendant to prove that it lacked control over the asset and also that it acted in good faith in receiving the asset. *Id.* at 1323-24. The Eleventh Circuit remanded the matter for the bankruptcy court to consider both whether the defendant had legal control over the funds in his attorney trust account and whether he acted in good faith in receiving them. *Id.* at 1324. The Court notes that in *Harwell* there was in fact a transfer as the debtor gave his funds to his counsel who placed them in counsel's attorney trust account, held in counsel's name. *Id.* at 1314-15. In addition, unlike in this case, it was fairly obvious that the defendant (debtor's former counsel) had received the funds in question as part of a coordinated scheme to assist the debtor in defrauding a particular creditor. *Id.*

The mere conduit defense is an affirmative defense to fraudulent transfer liability. *Mukamal v. BMO Harris Bank N.A. (In re Palm Beach Fin. Partners, L.P.)*, 488 B.R. 758, 769 (Bankr. S.D. Fla. 2013) (citing *Perlman v. Bank of Am., N.A.*, 2012 U.S. Dist. LEXIS 71663, at *5, 2012 WL 1886617, at *2 (S.D. Fla. 2012)); *Perlman v. Bank of Am., N.A.*, 561 F. App'x 810, 813 (11th Cir. 2014) ("[T]he 'mere conduit' theory must be affirmatively proved by the one seeking to obtain its protection."). It is not necessary for a complaint to anticipate defenses. *In re Palm Beach Fin. Partners, L.P.*, 488 B.R. at 771. For this reason, it is generally not proper to dismiss a complaint because it fails to negate an affirmative defense. *Id.*

On the other hand, a court may consider an affirmative defense at the pleading stage "when the complaint affirmatively and clearly shows the conclusive applicability of the defense to bar the action." *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1277 (11th Cir. 2004) (quotations omitted); *Bingham v. Thomas*, 654 F.3d 1171, 1175 (11th Cir. 2011) (citations omitted). In this case, the Trustee had ample reason to challenge the Defendants' good faith. As discussed below, the Trustee claims that the Defendants aided and abetted Mr. Simpson's wrongful acts. The Trustee had the incentive to paint as bleak a picture as possible of the Defendants' knowledge and actions. Before the Trustee filed his motion seeking permission to file amended complaints, the Trustee had the benefit of this Court's Dismissal Order which stated these same things. And so, with new text in the proposed amended complaints, the Trustee explicitly attempts to negate the Defendant's good faith.

While the Trustee included some additional relevant language in the proposed amended complaints compared to the Trustee's original complaints, the Trustee's overall presentation on this issue remains the same. The Trustee alleges that there were circumstances that should have lead the Defendants to investigate the Debtors and, had they done so, the Defendants would have discovered Mr. Simpson's illegal scheme. In effect, the Trustee argues that the Defendants were on inquiry notice of Mr. Simpson's fraud and thus did not receive the deposits in good faith. However, as the Eleventh Circuit has repeatedly confirmed, under Florida law the Defendants had no duty to investigate transactions involving the Debtors' own demand deposit accounts. *Perlman v. Wells Fargo Bank, N.A.*, 559 F. App'x 988, 993 (11th Cir. 2014) (citations omitted); *Lawrence v. Bank of Am., N.A.*, 455 F. App'x 904, 907 (11th Cir. 2012) (citations omitted). "Mere conduits, such as lawyers and banks, do not have an affirmative duty to investigate the underlying actions or intentions of the transferor." *In re Harwell*, 628 F.3d at 1324. If this Court were to rule that anything less than actual notice of Mr. Simpson's fraudulent scheme is sufficient to negate the good faith of the Defendants, this would be tantamount

to requiring them to have investigated their depository clients, a burden inconsistent with applicable law.

When the fraudulent transfer defendant is a banking institution that conducts routine banking services and the transfer in question is a deposit into the debtor's own demand deposit account, lack of good faith may only be proven by showing that the defendant had actual knowledge that the debtor was acting in an illegal manner.   In the proposed amended complaints, among other similar allegations, the Trustee alleges that the Defendants knew that Rollaguard was a startup company, the Defendants knew that Rollaguard was obtaining all of its revenue from investors, the Defendants knew that Mr. Simpson controlled both Rollaguard and Shamrock Jewelers and that these were separate entities, and the Defendants allowed Mr. Simpson to transfer funds among the accounts at each Defendant at will. Elsewhere in the proposed amended complaints,[13] the Trustee alleges that Mr. Simpson caused the Debtors to violate various banking laws and regulations and that the Defendants knew or should have known this.   But even if all of the allegations in the proposed amended complaints are proven, the Court would not be convinced that any of the Defendants actually knew that Mr. Simpson was operating a fraudulent scheme through the Debtors.   Mr. Simpson initiated a large number of transactions in the Debtors' accounts involving large sums of money.   Mr. Simpson caused the Debtors to routinely overdraw their accounts and to have insufficient funds to cover payments.   Mr. Simpson transferred funds, after they were deposited in the accounts, to a variety of entities including

---

[13] Depending on the proposed amended complaint, the Trustee includes between 47 and 49 introductory paragraphs, all of which are incorporated into each count of the subject amended complaint.  The counts themselves contain restatements of the relevant legal standards and only short summaries of allegedly relevant facts without cross-reference to any of the many paragraphs incorporated by reference.  To a great extent it is impossible to determine which of the specific allegations in the introductory paragraphs of the proposed amended complaints are intended to support each of the Trustee's claims. For example, each of the proposed amended complaints includes a paragraph with a number of lettered subparagraphs explicitly addressing the alleged lack of good faith of the relevant Defendant for purposes of the conduit defense.  But it is unclear whether the Trustee is relying on these allegations also in connection with the counts based in aiding and abetting. Rather than attempt to parse the matter further, for purposes of this order the Court has assumed that every factual allegation in the incorporated paragraphs of the proposed amended complaints is intended to be relevant to every count of the proposed amended complaint.

between the Debtors and to himself, in the end leaving the accounts empty or overdrawn.   Mr. Simpson caused the Debtors to structure transactions likely in an effort to avoid reporting requirements.   Some of the Defendants knew that Mr. Simpson had written checks on the Debtors' accounts and asked the payees not to deposit them as the Debtors did not have sufficient funds.   Some of these things may have violated applicable banking laws and regulations.   Certain of the Defendants found it appropriate to monitor the Debtors' transactions.   It is not surprising that the Defendants maintained documents recording the Debtors' insufficient funds transactions, overdrafts and the like, sent the Debtors numerous notices regarding these events, and even met with Mr. Simpson on occasion to question these practices without learning more.   Mr. Simpson was a difficult client and caused headaches for the Defendants.   Some of the Defendants may have considered terminating their banking relationship with the Debtors but did not do so.   But these allegations, if proven, do not mean that any of the Defendants actually knew that Mr. Simpson was defrauding others.

In each proposed amended complaint, the Trustee added a few allegations tailored to the specific Defendant that the Trustee suggests indicate actual knowledge on the part of the relevant Defendant.   In paragraphs 36 and 47(g) of the proposed amended complaint against PNC Bank, the Trustee alleges that PNC Bank had actual knowledge that Mr. Simpson was defrauding investors because a bank manager learned that Mr. Simpson had "produced fraudulent letters purporting to confirm available bank balances" and an investor sought confirmation of the bank balances from PNC Bank.   Yet there is no specific information in these paragraphs from which one could ascertain the materiality of the bank balance discrepancy.   It is quite a jump in logic to go from the fact that Mr. Simpson provided bank balances to an investor that proved to be inaccurate to the conclusion that Mr. Simpson is involved in a fraud.   Similarly, in paragraph 47(e) of that same proposed amended complaint, the Trustee alleges that PNC Bank had learned that Mr. Simpson had provided "one false wire confirmation number . . . in order to hinder, delay, or defraud" a creditor.   All we know from this

allegation is that Mr. Simpson gave a wire confirmation number to someone that was not correct. There is nothing in that paragraph or elsewhere in the proposed amended complaint that would lead anyone to conclude that providing an incorrect wire transfer confirmation number was indicative of fraud. In paragraph 47(f) of that same proposed amended complaint, the Trustee alleges that PNC Bank knew Mr. Simpson "was pledging funds to third parties . . . that were not available on deposit" and that a bank officer stated that he or she was "'very comfortable' with this arrangement." In support of the Trustee's request to file the proposed amended complaints, the Trustee filed all of the discovery that the Trustee argued supported the amendments to the complaints and the Court reviewed those documents in preparation for the hearing on November 7, 2017. Among the documents the Trustee obtained from PNC Bank is an internal memo dated February 6, 2014. That memo reads as follows: "Comment:  client indicated a wire was on its way for $15,000. As of 12:20, I am still waiting on a trace number to confirm the incoming wire. As the business banker, I am very comfortable with the owner and the business. I recommend paying this item." The text of paragraph 47(f) of the proposed amended complaint would lead one to conclude that a banker at PNC Bank had expressed he was "very comfortable" with an ongoing practice of Mr. Simpson causing the Debtors to initiate payments for which they did not have sufficient funds. But a review of the memo behind this allegation indicates that the banker was stating his personal comfort with regard to Mr. Simpson and his business and, based on that view, recommending payment of a particular item. Contrary to the Trustee's suggestion, the actual underlying document supports the conclusion that PNC Bank did not in fact have actual knowledge that Mr. Simpson was involved in a fraud.[14] In paragraphs 33 and 46(h) of the proposed amended complaint against Chase Bank, the Trustee alleges that Chase Bank

---

[14] In the present procedural context, it is typically not appropriate to consider any documents other than the proposed amended complaint, documents attached to it and, sometimes, documents that are referenced in the complaint and central to the claim. However, in this case, the document in question was filed by the Trustee in support of the very motion now under consideration by the Court.

had actual knowledge that investor funds were flowing into and out of Debtor accounts and that the funds were being used for "non-business purposes, including to fund Simpson's personal expenses." In paragraph 37 of the proposed amended complaint against TD Bank, the Trustee alleges that the bank permitted "the withdrawal for improper purposes of hundreds of thousands of dollars of funds that TD Bank knew at the time belonged to Rollaguard investors.  TD Bank sanctioned and enabled this conduct despite the fact that it had already determined that Simpson was using his relationship with TD Bank for fraudulent purposes."  These are conclusory statements.  There are no specific allegations to support them.  It is necessary in cases such as this to support such statements with allegations to support the conclusion that the defendant had relevant knowledge of the debtor's business enterprise and then provide actual examples of how funds were used, to support the contention that they were used for purposes inconsistent with the debtor's business enterprise.  The proposed amended complaints provide none of this.  These new allegations do not change the Court's view that the proposed amended complaints fail to provide adequate, plausible allegations to support lack of good faith on behalf of any of the Defendants.

Although the conduit defense is an equitable doctrine developed over decades, it is only relatively recently that the Eleventh Circuit explicitly ruled that the conduit defense involves an affirmative good faith requirement, in a case involving a stark instance of bad faith as the defendant was in fact conspiring with the debtor to defraud a particular creditor.  *In re Harwell*, 628 F.3d at 1323-24.  Since that decision, there has been scant case law addressing the nature of the good faith required to support the conduit defense.  In light of the Eleventh Circuit's consistent rulings on the scope of duties of depository banks in this context, cited above, a depository bank should not be held to a standard less than actual knowledge.

Yet even if the Defendants here were held to an inquiry notice standard, the proposed amended complaints would not be sufficient.  The Court must look behind the Trustee's bald

statements that the Defendants knew Mr. Simpson was committing fraud, converting investor funds to his own ends, and breaching his fiduciary duties to the Debtors, to the underlying factual allegations from which the Trustee asks the Court to make those conclusions. There must be a nexus between those underlying factual allegations and the Debtors' fraudulent purpose such that the Defendants would reasonably be expected to connect what they know with the conclusion that the Debtors were acting in a wrongful manner. But the Trustee's allegations in this case amount to a game of six degrees of separation. Mr. Simpson caused the Debtors to enter into many transactions, involving funds flowing into and out of their accounts with the Defendants. Mr. Simpson regularly caused the Debtors to overdraw their accounts and to issue payments for which there were insufficient funds. Mr. Simpson corralled funds from several accounts to make certain payments. Mr. Simpson sometimes made multiple payments in smaller amounts possibly in an effort to avoid reporting requirements. In short, Mr. Simpson was a troublesome client for the Defendants. The activity in the Debtors' accounts required the Defendants to monitor those accounts more closely and to send the Debtors numerous official notices. The Defendants met with Mr. Simpson in an attempt to stem the number of transactions that required extra involvement from the bank. The Trustee paints these facts with dramatic language, but the foregoing summary is an objective overview of the facts presented in the proposed amended complaints. From these allegations, the Trustee asks the Court to conclude that the Defendants should have known that Mr. Simpson was a fraudster who was taking money for his own benefit. Yet there is nothing in the proposed amended complaints that would even suggest that the Defendants knew anything about the actual activities of the Debtors, their agreements with parties from whom they received payment, or their relative corporate relationships. The Trustee baldly alleges only that the Defendants knew that Rollaguard received its income from investments, that the Defendants knew that the Debtors were separate corporate entities, and that the Defendants knew that the Debtors shuffled funds amongst themselves apparently to avoid reporting requirements.

From this, the Trustee argues that the Defendants should have investigated further and, if they had done so, would have discovered Mr. Simpson's fraud, shut down the Debtors' accounts, and saved the Debtors' creditors from harm. Based on the actual allegations in the proposed amended complaints, this would be a huge leap. Would the Defendants have been better off if they terminated their relationships with the Debtors and sent the Debtors elsewhere? It certainly looks like that was the case as Mr. Simpson's banking practices were obviously a distraction and, in spite of the Trustee's blanket allegations otherwise, it seems unlikely the benefit the Defendants received in overdraft fees and the like was worth the time and effort. But, based on the actual allegations in the proposed amended complaints, were the Defendants under any duty to question Mr. Simpson's motives or good faith with regard to anyone other than the Defendants themselves? Even if the concept of inquiry notice applies to these Defendants, and to do so would violate established law with regard to the duties of depository banks, the answer is no.

Taking as proven all of the allegations in the proposed amended complaints, the Defendants acted in good faith in receiving the Debtors' deposits into their own bank accounts. The accounts in question were routine demand deposit accounts. The Debtors maintained complete autonomy over those accounts. The Defendants initiated all transactions at the request of the person with authority to direct them. In light of these facts, other than in connection with claims relating to satisfaction of overdrafts, none of the Defendants are "transferees" from whom the Trustee may seek judgment under section 550. Those claims presented in counts I and II of the amended complaints based on the Debtors' deposits into their own unrestricted bank accounts (excluding claims relating to satisfaction of overdrafts) have no basis in law and the proposed amendments to those portions of counts I and II would be futile for this additional and separate reason. This is the same legal ruling made by the Court in the Dismissal Order and nothing in the proposed amended complaints would

cause the Court to change that ruling.  The Court notes that this ruling, by itself, also eliminates the vast majority of the Trustee's fraudulent transfer claims.

To be clear, those portions of counts I and II of the amended complaints expressing claims related to satisfaction of overdrafts, as discussed in more detail below, do not present the same concerns with regard to the "transfer" and "transferee" requirements of applicable law.  When a bank permits a customer to overdraw its account, the bank is making a loan to the customer.  When the bank customer satisfies that overdraft by making a deposit to the account, the customer is repaying credit made available by the bank.  The satisfaction of an actual bank overdraft is a potentially avoidable transfer.  In that instance, the bank is a transferee under applicable law as it is receiving the repayment for the bank's own account.[15]

But all of the Trustee's fraudulent transfer claims in counts I and II of the proposed amended complaints, including both those arising solely from the Debtors' deposits into their own unrestricted bank accounts as well as those arising from satisfaction of overdrafts, suffer from a fatal shortcoming. In order to prove these claims, the Trustee must show that the alleged transfers were made with actual intent to hinder, delay, or defraud creditors.  The proposed amended complaints do not contain sufficient allegations to plausibly support the conclusion that the Debtors deposited their own funds into their own unrestricted bank accounts or satisfied their own overdrafts with the intent to hinder, delay, or defraud creditors, as required by the relevant statutes.

Because actual intent to hinder, delay, or defraud is difficult to prove, courts look to the totality of the circumstances surrounding the allegedly fraudulent transfer, and this often involves analyzing

---

[15] The Trustee alleges that overdrafts were "either repaid by future deposits . . . or by dishonored transactions . . . ."  It is unclear what the Trustee means by "dishonored transactions."  If the Trustee intends the phrase dishonored transactions to include the presentation of checks for which a Debtor had insufficient funds, where a Defendant did not in fact permit an actual overdraft in the Debtor's bank account, such provisional settlements do not constitute transfers subject to avoidance.  *Sarachek v. Luana Sav. Bank (In re Agriprocessors, Inc.)*, 547 B.R. 292, 308 (N.D. Iowa 2016);  *In re Apponline.com, Inc.*, 296 B.R. 602, 615-20 (Bankr. E.D.N.Y. 2003).  In light of the Court's other rulings in this order, which dispose of all fraudulent transfer claims for other reasons, it is not necessary to address this issue further.

the traditional badges of fraud. *Dev. Specialists, Inc. v. Hamilton Bank, N.A. (In re Model Imperial, Inc.)*, 250 B.R. 776, 791 (Bankr. S.D. Fla. 2000) (citing *Dionne v. Keating (In re XYZ Options, Inc.)*, 154 F.3d 1262, 1271-72 (11th Cir. 1998)).  The commonly listed badges of fraud include: (1) the transfer was to an insider; (2) the debtor retained possession or control of the property transferred after the transfer; (3) the transfer was not disclosed or was concealed; (4) before the transfer was made the debtor had been sued or threatened with suit; (5) the transfer was of substantially all of the debtor's assets; (6) the debtor absconded; (7) the debtor removed or concealed assets; (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred; (9) the debtor was insolvent or became insolvent shortly after the transfer was made; (10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.  *Id.* (citing *In re XYZ Options, Inc.*, 154 F.3d at 1271-72).[16]  But the traditional badges of fraud are not the sole indicators of actual fraudulent intent.  The traditional badges of fraud represent examples of indicators of actual fraudulent intent, culled from decades of case law.  They are intended to be guideposts—as opposed to ineluctable factors—in a court's analysis of the totality of the circumstances to determine whether a transfer was made with actual fraudulent intent.  That the proposed amended complaints here do not rely exclusively on the traditional badges of fraud is not fatal.  Instead, the Court must look to the factual allegations in the proposed amended complaints to

---

[16] Similarly, under Florida law, in determining actual intent to defraud courts may consider whether:

> (a) The transfer or obligation was to an insider. (b) The debtor retained possession or control of the property transferred after the transfer. (c) The transfer or obligation was disclosed or concealed. (d) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit. (e) The transfer was of substantially all the debtor's assets. (f) The debtor absconded. (g) The debtor removed or concealed assets. (h) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred. (i) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred. (j) The transfer occurred shortly before or shortly after a substantial debt was incurred. (k) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

Fla. Stat. § 726.105(2).

determine whether, if proven, they would support a finding of actual intent to hinder, delay, or defraud.

Before the Court engages in a review of the allegations in the proposed amended complaints intended to support a finding of actual intent to defraud, it is useful to consider what needs to be proven in this regard.  In prosecuting a fraudulent transfer claim based on actual intent, it is typically not sufficient to show that the debtor intended to defraud someone and the debtor also made a transfer.  Just because a debtor is involved in a fraudulent scheme does not mean that every transfer made by that debtor is made with fraudulent intent.[17]  In order to prosecute a claim based on actual intent to hinder, delay, or defraud a creditor, the plaintiff must show that the alleged fraudulent intent is related to the transfers sought to be avoided. *Bakst v. Bank Leumi, USA (In re D.I.T., Inc.)*, 561 B.R. 793, 803 (citing *Sharp Int'l Corp. v. State St. Bank & Trust Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43, 56-57 (2d Cir. 2005)).

> The most common example is when a debtor transfers assets to an insider, for no consideration, when the debtor is involved in significant litigation or is being pursued by creditors, for the obvious purpose of placing assets beyond the reach of creditors. In such a case, the transfer achieves the debtor's fraudulent end.

*Id.*  In the present case, the transfers at issue are the Debtors' deposits into their own bank accounts maintained at the Defendants and the Debtors' satisfaction of overdrafts in those same accounts.  The proposed amended complaints must include allegations of fact which, if proven, show that the Debtors had fraudulent intent in taking those specific actions.

The Trustee alleges that Mr. Simpson regularly caused Rollaguard to transfer money to the Shamrock Entities, thereby placing such funds out of the reach of Rollaguard's creditors and using

---

[17] There are limited circumstances where a debtor's fraudulent intent in making certain transfers is presumed.  For example, if a debtor is perpetrating a Ponzi scheme, a transfer made in furtherance of that Ponzi scheme is deemed to have been made with actual fraudulent intent. *Welt v. Publix Super Markets, Inc. (In re Phoenix Diversified Inv. Corp.)*, 2011 Bankr. LEXIS 4100, at *7-9, 2011 WL 2182881, at *3 (Bankr. S.D. Fla. 2011).  However, the transfer must be specifically in furtherance of the fraudulent scheme and not some unrelated transaction.  *Id.*  The facts of the present case do not present a Ponzi scheme or even a Ponzi-like scheme involving rotating investment and investor repayment.  Mr. Simpson is alleged to have committed a straightforward fraud in bilking investors, taking their funds and not paying anyone back.

such funds for Mr. Simpson's personal benefit.  But these and similar allegations focus on what happened to the funds after they were in Rollaguard's accounts, not on Rollaguard's deposits into those accounts or Rollaguard's satisfaction of overdrafts in those accounts, the alleged transfers at issue here.  That Rollaguard, acting through Mr. Simpson, had fraudulent intent in transferring funds out of its bank accounts maintained at the Defendants is not probative on the issue of whether Rollaguard had fraudulent intent when it deposited funds into its own bank accounts or satisfied overdrafts in those accounts.

The Trustee alleges that the Debtors removed property from the reach of their creditors by depositing monies in their own bank accounts and by satisfying their own overdrafts.  Let us focus on the actual transfers alleged in this case.  The transfers at issue in the proposed amended complaints do not involve any Debtor depositing its funds into an account owned by another Debtor or satisfying the overdrafts of another Debtor.  The "transfers" in question are each Debtor's deposits into its own bank accounts and each Debtor's satisfaction of its own overdrafts.  These activities, by themselves, did not remove funds from the reach of any Debtor's creditors.[18]  The Debtors transferred and otherwise used the funds after they had been deposited, but those later transfers are not at issue in the fraudulent transfer claims here.

The Trustee alleges that Mr. Simpson was causing the Debtors to engage in various fraudulent or deceptive schemes at the time of the deposits and satisfaction of overdrafts that the Trustee is attempting to avoid in these cases.  The Trustee states that it was necessary for Mr. Simpson and the Debtors to have bank accounts in order to effectuate Mr. Simpson's fraudulent scheme, and so the Trustee alleges that each time the Debtors deposited funds into their own bank accounts or satisfied their own overdrafts those acts were imbued with the bad intent of Mr. Simpson and the Debtors.

---

[18] One might argue that the satisfaction of an overdraft could result in reduction of funds available to pay other creditors. Yet in this case, in the end, the accounts in question were left empty or slightly overdrawn.  The net effect of all of the overdrafts was for the benefit of the Debtors, as they enjoyed repeated short term credit from the Defendants.

But this argument goes too far.  Nearly every fraudulent scheme, from complex Ponzi schemes to the most straightforward bait and switch, involves the use of a bank account, a brokerage account, or some other financial accommodation.  To suggest that a fraudster's mere use of a bank or financial institution as an intermediary to accomplish the fraud means that each transaction with the intermediary is also tainted with fraudulent intent is to make the bank or other financial intermediary a target for the debtor's creditors, even where the bank or other financial intermediary has no knowledge of the fraud.  The more well-reasoned case law does not support this leap.  *See Perkins v. Lehman Bros. (In re Int'l Mgmt. Assoc.'s, LLC)*, 563 B.R. 393, 414-19 (Bankr. N.D. Ga. 2017).  That the Debtors, through Mr. Simpson, were obtaining investments they never intended to repay, and moving funds among themselves and for the benefit of Mr. Simpson, does not mean that when they put their own funds in their own bank accounts, or satisfied their own overdrafts, that those actions were taken with actual intent to hinder, delay, or defraud creditors.  In other words, there is no connection between the alleged transfers at issue here and the Debtors' collective intent, acting through Mr. Simpson, to fraudulently obtain investments they did not intend to return.

The Trustee alleges that the Debtors were not paying their debts as they became due.  This allegation is sometimes helpful to support the conclusion that a failing debtor made a transfer with the intent to place the asset out of view of the debtor's creditor body generally.  In this case, the allegation lends nothing to the question of whether the Debtors' deposits into their own unrestricted bank accounts or satisfaction of their own overdrafts were done with fraudulent intent.  As discussed above, those acts had no material impact on the Debtors' ability to pay creditors and are not in themselves stained with bad intent.

The proposed amended complaints do not contain sufficient allegations that, if proven, would plausibly support the conclusion that the Debtors deposited their own funds into their own unrestricted bank accounts or satisfied their own overdrafts with the intent to hinder, delay, or defraud

creditors, as required by the relevant statutes. None of the Trustee's claims set out in counts I and II of the proposed amended complaints state claims under applicable law and thus the proposed amendments would be futile. With regard to most of the Trustee's actual fraud claims, excluding only those relating to satisfaction of overdrafts, this is the same ruling the Court made in its original Dismissal Order. Here, the Court extends that ruling to those portions of counts I and II relating to satisfaction of overdrafts. Nothing in the proposed amended complaints would cause the Court to change that ruling. The Court notes that this ruling eliminates all the Trustee's fraudulent transfer claims.

In summary, the proposed amendments to counts I and II would be futile for the following reasons. With regard to those claims based on the Debtors' deposits into their own unrestricted bank accounts and which deposits are not alleged to constitute satisfaction of overdrafts in the relevant account (a) the deposits are not transfers subject to avoidance under applicable law, and (b) the Defendants are not transferees of such deposits from whom the Trustee may recover under applicable law. Each of these reasons is by itself sufficient to deny amendment with regard to such claims. With regard to all claims presented in counts I and II, including those arising from the satisfaction of overdrafts as well as those arising solely from the Debtors' deposits into their own unrestricted bank accounts, the proposed amended complaints lack specific allegations to support the Trustee's claims that the alleged transfers were made with actual intent to hinder, delay, or defraud creditors. This is a separate reason to deny amendment to counts I and II with regard to claims arising from deposits, and is also a reason to deny amendment to counts I and II with regard to claims arising from satisfaction of overdrafts. None of the claims stated in counts I and II of the proposed amended complaints meet the standard for amendment under Fed. R. Bankr. P. 7015 as set out in *Foman v. Davis.*

**Counts III, IV, VI and VII**

As in the original complaints, in counts III and IV of the proposed amended complaints the Trustee argues that the Defendants had actual and/or constructive knowledge of Mr. Simpson's suspicious activity, that they rendered substantial assistance to Mr. Simpson by violating federal banking regulations and banking norms, and that the Defendants are therefore liable for aiding and abetting Mr. Simpson's conversions of investor funds. The Trustee seeks a money judgment against each of the Defendants.

Counts VI and VII in the proposed amended complaints are new. In counts VI and VII, the Trustee argues that the Defendants had actual and/or constructive knowledge of Mr. Simpson's breach of his fiduciary duties to the Debtors, that they rendered substantial assistance to Mr. Simpson by allowing the Debtors' bank accounts to remain open and by permitting Mr. Simpson to cause the Debtors to make allegedly atypical transactions in those accounts and otherwise by providing Mr. Simpson an "unregulated platform" to effectuate his schemes, and that the Defendants are therefore liable for aiding and abetting Mr. Simpson's breach of fiduciary duties to the Debtors. The Trustee seeks a money judgment against each of the Defendants.

In support of the claims in counts III, IV, VI and VII, the Trustee maintains that the Defendants disregarded federal banking regulations thereby allowing Mr. Simpson to use the Debtors' bank accounts to take funds for himself at the expense of the Debtors' creditors. For example, the Trustee alleges that, during the respective banking relationships, the Defendants failed to respond properly when Mr. Simpson purchased cashier checks where the "remitter" was a different person or entity from the owner of the bank account. The Trustee alleges that some of the Defendants failed to respond properly to Mr. Simpson's purchasing of cashier checks using monies from multiple bank accounts, or withdrawing monies from one bank account and consecutively depositing those monies in another account, in order to purchase cashier checks. The Trustee maintains that, under these

circumstances, the Defendants improvidently sold cashier checks to Mr. Simpson at the expense of the Debtors' creditors, because the Defendants should have known that the recipients would be misled as to the source of the payments.[19]  In this vein, the Trustee also points to the fact that the Defendants permitted Mr. Simpson to overdraw the Debtors' bank accounts repeatedly during the four-year period prior to the commencement of this chapter 7 case.  In addition to these common allegations, the Trustee makes a handful of allegations specific to the separate Defendants, which the Court has addressed above in connection with the analysis of the conduit defense.[20]

The Trustee argues that these facts, accompanied by the magnitude and number of the deposits and withdrawals, put the Defendants on actual and/or constructive notice (a) that Mr. Simpson was converting monies from the Debtors' bank accounts for an improper purpose or for his own personal use and (b) that Mr. Simpson was breaching his fiduciary duties to the Debtors.

Under Florida law, to state a claim for aiding and abetting, a plaintiff must allege: "(1) an underlying violation on the part of the primary wrongdoer; (2) knowledge of the underlying violation by the alleged aider and abetter; and (3) the rendering of substantial assistance in committing the wrongdoing by the alleged aider and abettor." *Lawrence*, 455 F. App'x at 906-07 (citing *AmeriFirst Bank v. Bomar*, 757 F. Supp. 1365, 1380 (S.D. Fla. 1991); *ZP No. 54 Ltd. P'ship v. Fid. & Deposit Co. of Md.*, 917 So. 2d 368, 372 (Fla. 5th DCA 2005)).  There appears to be no dispute that underlying violations

---

[19] In light of the substantive consolidation of the Debtors and Shamrock Jewelers, done at the Trustee's request, it is hard to see how creditors were harmed by not knowing the ultimate source of payments they received.  In order to obtain substantive consolidation, among other things, the Trustee argued convincingly that the financial affairs of the Debtors and Shamrock Jewelers were hopelessly intertwined.  The Court notes that in substantively consolidating the Debtors and Shamrock Jewelers in this case, the Court did not preserve inter-company claims.  *See* ECF No. 126, Case No. 14-38071-EPK.  Thus, for all purposes in this bankruptcy case, the assets and liabilities of the Debtors and Shamrock Jewelers are combined as if they were a single entity.

[20] As addressed in footnote 14, *supra*, it is unclear whether these individualized allegations were intended by the Trustee to support the aiding and abetting claims as most of them were presented in the factual allegations explicitly relating to the conduit defense.  Again, for purposes of this order, the Court assumes that all of the allegations in the introductory paragraphs of the proposed amended complaints are intended to support each count of the proposed amended complaints.

exist.  Mr. Simpson misappropriated funds from the Debtors for his own personal use and other improper uses.  The Court focuses on the latter two elements.

"[W]hen a claim of aiding and abetting is asserted against a bank, the second element— knowledge—will only be satisfied if the plaintiff pleads facts demonstrating that the bank had 'actual knowledge' of the wrongdoings."  *Perlman*, 559 F. App'x at 993 (citing *Lawrence*, 455 F. App'x at 907). "And while actual knowledge may be shown by circumstantial evidence, the circumstantial evidence must demonstrate that the aider and abettor actually knew of the underlying wrongs committed."  *Id.* (citing *Wiand v. Wells Fargo Bank, N.A.*, 938 F. Supp. 2d 1238, 1244 (M.D. Fla. 2013)).  Importantly, in the context of aiding and abetting claims against banks, Florida law does not require banks to investigate their customers' transactions.  *Lawrence*, 455 F. App'x at 907 (citing *Home Fed. Sav. & Loan Ass'n of Hollywood v. Emile*, 216 So. 2d 443, 446 (Fla. 1968)); *O'Halloran v. First Union Nat'l Bank of Fla.*, 350 F.3d 1197, 1205 (11th Cir. 2003) (finding that banks have the "right to assume that individuals who have the legal authority to handle the entity's accounts do not misuse the entity's funds").

The allegations in the proposed amended complaints, if proven, would not raise a plausible inference that any of the Defendants actually knew Mr. Simpson was engaged in conversion or breach of fiduciary duty.  Some of Mr. Simpson's actions were suspicious.  But mere suspicion is not sufficient to trigger any obligation by the Defendants to investigate.  *Lawrence*, 455 F. App'x at 907; *Perlman*, 559 F. App'x at 993-94.  Since the proposed amended complaints fail to plead sufficient facts to support a plausible inference that the Defendants had actual knowledge of Mr. Simpson's wrongful acts, the proposed amendments in counts III, IV, VI and VII would be futile.  This is the same ruling the Court made in the Dismissal Order with regard to the claims presented in counts III and IV of the original complaints and nothing in the proposed amended complaints would cause the Court to change its ruling.  While the Trustee has added some additional language in the proposed amended complaints, most of these allegations are simply more of the types that the Court found wanting in the Dismissal

Order.  To the extent there are new, specific allegations aimed at individual Defendants, these are conclusory in nature and are not supported by concrete allegations, as discussed more fully in the Court's analysis of the conduit defense.  The Trustee relies on all of these same allegations to support the knowledge element of its claims in new counts VI and VII and so the same analysis applies to those new claims.  This ruling alone is sufficient to deny amendment to counts III, IV, VI and VII.  None of the claims stated in counts III, IV, VI and VII of the proposed amended complaints meet the standard for amendment under Fed. R. Bankr. P. 7015 as set out in *Foman v. Davis.*

Likewise, counts III, IV, VI and VII do not contain sufficient allegations to plausibly support the inference that the Defendants rendered substantial assistance to Mr. Simpson's conversions or breach of fiduciary duties.  "Substantial assistance occurs when a defendant affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the breach to occur."  *Hsi Chang v. JPMorgan Chase Bank, N.A.*, 845 F.3d 1087, 1098 (11th Cir. 2017) (quoting *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 295 (2nd Cir. 2006)).  "Mere inaction 'constitutes substantial assistance only if the defendant owes a fiduciary duty directly to the plaintiff.'"  *Id.* (quoting *Lerner*, 459 F.3d at 295).  There is nothing in the proposed amended complaint that would lead the Court to believe that any of the Defendants affirmatively assisted or concealed Mr. Simpson's wrongful acts.  The Trustee's claims are based on alleged failures to act by the Defendants.  In this case, the Trustee is the stand-in for the Debtors, so the Trustee must show that the Defendants had a duty to the Debtors that they failed to satisfy.  The Trustee has not plead sufficient facts to show that any of the Defendants owed any duty to the Debtors, fiduciary or otherwise, other than the duty to complete banking transactions as directed by the Debtors' authorized agent, which duty they faithfully complied with.  As discussed below in connection with count V, the Defendants' duties arising under the banking regulations and customary banking practices pointed to by the Trustee are not duties for the benefit of the Debtors.  Nor do the Trustee's allegations support the conclusion that any of the Defendants breached any duty

whatsoever relevant to this case. "Red flags" and mere suspicions are insufficient to trigger any obligation by the Defendants to investigate. *Lawrence*, 455 F. App'x at 907; *Perlman*, 559 F. App'x at 993-94. Such "red flags" or suspicions are not sufficient to elevate the Defendants' alleged inactions into the realm of "substantial assistance." Since the proposed amended complaints do not plead sufficient facts to plausibly support the inference that any of the Defendants rendered substantial assistance to Mr. Simpson's conversions or breach of fiduciary duties, the proposed amendments to counts III, IV, VI and VII would be futile. This is substantially the same ruling the Court made in the Dismissal Order with regard to the claims presented in counts III and IV of the original complaints and nothing in the proposed amended complaints would cause the Court to change its ruling. While the Trustee has added some additional language in the proposed amended complaints, the allegations are simply more of the types that the Court found wanting in the Dismissal Order. To the extent there are new, specific allegations aimed at individual Defendants, these are conclusory in nature and are not supported by concrete allegations, as discussed more fully in the Court's analysis of the conduit defense. The Trustee relies on all of these same allegations to support the substantial assistance element of its claims in new counts VI and VII and so the same analysis applies to those new claims. This ruling alone is sufficient to deny amendment to counts III, IV, VI and VII. None of the claims stated in counts III, IV, VI and VII of the proposed amended complaints meet the standard for amendment under Fed. R. Bankr. P. 7015 as set out in *Foman v. Davis*.

In summary, the proposed amendments to counts III, IV, VI and VII would be futile for two independent reasons. First, the Trustee does not plead sufficient facts which, if proven, would support the conclusion that the Defendants had actual knowledge of Mr. Simpson's wrongful acts. Second, the Trustee does not plead sufficient facts which, if proven, would support the conclusion that any of the Defendants rendered substantial assistance to Mr. Simpson's conversions or breach of fiduciary

duties.  None of the claims stated in counts III, IV, VI and VII of the proposed amended complaints meet the standard for amendment under Fed. R. Bankr. P. 7015 as set out in *Foman v. Davis*.

### Count V

As in the original complaints, in count V of the proposed amended complaints, the Trustee argues that the Defendants were negligent in processing wire transfers from the Debtors' bank accounts.  According to the Trustee, state and federal law, "including but not limited to Chapter 670 of the Florida Statutes," imposed a duty of care on the Defendants "to correctly, cautiously, and prudently process the [withdrawals] subject to commercially reasonable security procedures."  The Trustee alleges that the Defendants breached that duty by violating federal banking regulations or by lacking good faith in processing the wire transfers due to their actual or constructive knowledge of Mr. Simpson's suspicious activities.  As a result, the Trustee alleges that the Defendants caused damage to the Debtors in the amounts transferred by wire from the various bank accounts maintained at the Defendants and seeks money judgments.

To plead a claim for negligence under Florida law, the Trustee must allege a duty, a breach of that duty, causation, and damages. *Virgilio v. Ryland Group, Inc.*, 680 F.3d 1329, 1339 (11th Cir. 2012). Under Florida law, "establishing the existence of a duty . . . is a minimum threshold legal requirement that opens the courthouse doors to the moving party, and is ultimately a question of law for the court rather than a jury." *Williams v. Davis*, 974 So. 2d 1052, 1056 n.2 (Fla. 2007) (citing *McCain v. Florida Power Corp.*, 593 So. 2d 500, 502 (Fla. 1992)); *Virgilio*, 680 F.3d at 1339.  A duty of care may arise from four sources:  "'(1) legislative enactments or administration regulations; (2) judicial interpretations of such enactments or regulations; (3) other judicial precedent; and (4) a duty arising from the general facts of the case.'" *Clay Elec. Co-op., Inc. v. Johnson*, 873 So. 2d 1182, 1185 (Fla. 2003) (quoting *McCain*, 593 So. 2d at 503 n.2).

The Trustee seeks to establish a duty of care under state and federal law, "including but not limited to Chapter 670 of the Florida Statutes," "to correctly, cautiously, and prudently process the [withdrawals] subject to commercially reasonable security procedures." The essence of the Trustee's negligence claim is that the Defendants failed to monitor the Debtors' bank accounts and discover Mr. Simpson's fraudulent activity.

Florida law does not impose an independent duty on banks, in the course of routine banking services, to monitor transactions made by authorized agents of the account holder in order to protect the account holder against fraud or misappropriation. *Lawrence*, 455 F. App'x at 907 (citing *Emile*, 216 So. 2d at 446); *O'Halloran*, 350 F.3d at 1205. A bank's responsibility extends only to confirming that the agent, at the time of the transaction, has the authority to make the transaction. *O'Halloran*, 350 F.3d at 1205. There is nothing in the proposed amended complaints that would lead the Court to question Mr. Simpson's authority to initiate the relevant transactions on behalf of the Debtors.

Likewise, Chapter 670 of the Florida Statutes, titled "Uniform Commercial Code — Fund Transfers," does not impose a general duty on banks to monitor customer accounts for fraud or misappropriation for the benefit of the customers themselves. To the extent federal banking statutes and regulations, such as the Bank Secrecy Act, impose duties on banks, "those duties extend to the United States, not a bank's customers." *Wiand*, 86 F. Supp. 3d at 1322.

Nor does any duty on the part of the Defendants arise from the general facts of the case. As discussed above, "red flags" or mere suspicions are insufficient to trigger any obligation by the Defendant banks to investigate. *Lawrence*, 455 F. App'x at 907; *Perlman*, 559 F. App'x at 993-94.

Because the existence of a duty of care is essential to a claim for negligence and no duty exists here, the proposed amendments to count V would be futile. This is the same ruling made by the Court in its original Dismissal Order. Nothing in the proposed amended complaints would cause the Court to change that ruling. None of the claims stated in count V of the proposed amended

complaints meet the standard for amendment under Fed. R. Bankr. P. 7015 as set out in *Foman v. Davis*.

### In Pari Delicto Concerns

In the original Dismissal Order, the Court ruled that certain of the Trustee's claims relating to Shamrock Jewelers Loan & Guarantee, LLC were barred by the *in pari delicto* defense. In the proposed amended complaints, the Trustee no longer pursues claims relating to Shamrock Jewelers Loan & Guarantee, LLC. *See* note 1, *supra*. The Court ruled that none of the other claims stated in the original complaints were at that point in the proceedings barred by the *in pari delicto* defense, and the Court's analysis in the Dismissal Order applies equally to the claims stated in the proposed amended complaints. In addition, the fact that the Trustee now alleges that Mr. Simpson had been removed from control of Rollaguard prior to the commencement of this case likely provides another basis for ruling that the *in pari delicto* defense does not bar the Trustee's claims relating to that entity at this stage of the proceedings. *See Mukamal v. Nat'l Christian Charitable Found., Inc. (In re Palm Beach Fin. Partners, L.P.)*, Adv. Proc. No. 11-02940-EPK, 2018 Bankr. LEXIS 1196, at *31-32 (Bankr. S.D. Fla. Apr. 20, 2018) (citing *Scholes v. Lehmann*, 56 F.3d 750 (7th Cir. 1995)).

### ORDER

For the foregoing reasons, the Court hereby DENIES the Plaintiff's request, contained in the Trustee's omnibus motion [ECF No. 50, Adv. Proc. No. 16- 01755-EPK; ECF No. 57, Adv. Proc. No. 16-01756-EPK; and ECF No. 40, Adv. Proc. No. 16- 01757-EPK], to file amended complaints in these adversary proceedings.

###

Copies to all parties of record by the Clerk of Court.